# United States Court of Appeals
# for the Federal Circuit

---

**MODA HEALTH PLAN, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2017-1994

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00649-TCW, Judge Thomas C. Wheeler.

------------------------

**LAND OF LINCOLN MUTUAL HEALTH INSURANCE COMPANY, AN ILLINOIS NON-PROFIT MUTUAL INSURANCE CORPORATION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2017-1224

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00744-CFL, Judge Charles F. Lettow.

------------------------

**BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2017-2154

————————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00651-LKG, Judge Lydia Kay Griggsby.

------------------------

**MAINE COMMUNITY HEALTH OPTIONS,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2017-2395

————————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00967-EGB, Senior Judge Eric G. Bruggink.

---

## ON PETITIONS FOR REHEARING EN BANC

---

STEVEN ROSENBAUM, Covington & Burling LLP, Washington, DC, filed a petition for rehearing en banc for plaintiff-appellee in 2017-1994. Also represented by BRADLEY KEITH ERVIN; CAROLINE BROWN, PHILIP PEISCH, Brown & Peisch PLLC, Washington, DC.

DANIEL P. ALBERS, Barnes & Thornburg LLP, Chicago, IL, filed a petition for rehearing en banc for plaintiff-appellant in 2017-1224. Also represented by SCOTT E. PICKENS, Washington, DC; JONATHAN MASSEY, Massey & Gail LLP, Washington, DC.

LAWRENCE SHER, Reed Smith LLP, Washington, DC, filed a combined petition for panel rehearing and rehearing en banc for plaintiff-appellant in 2017-2154. Also represented by KYLE RICHARD BAHR, JAMES CHRISTOPHER MARTIN, CONOR MICHAEL SHAFFER, COLIN E. WRABLEY, Pittsburgh, PA.

STEPHEN JOHN MCBRADY, Crowell & Moring, LLP, Washington, DC, filed a petition for rehearing en banc for plaintiff-appellant in 2017-2395. Also represented by CLIFTON S. ELGARTEN, SKYE MATHIESON, DANIEL WILLIAM WOLFF.

ALISA BETH KLEIN, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, filed a response to the petitions for defendant-appellee in 2017-1224, 2017-2154, 2017-2395 and defendant-appellant in 2017-1994. Also represented by JOSEPH H. HUNT, MARK B. STERN, CARLEEN MARY ZUBRZYCKI.

WILLIAM LEWIS ROBERTS, Faegre Baker Daniels LLP, Minneapolis, MN, for amici curiae Association for Community Affiliated Plans, Alliance of Community Health Plans in 2017-1994. Also represented by JONATHAN WILLIAM DETTMANN, NICHOLAS JAMES NELSON.

STEVEN ALLEN NEELEY, JR., Husch Blackwell LLP, Washington, DC, for amicus curiae National Association of Insurance Commissioners in 2017-1994. Also represented by KIRSTEN A. BYRD, Kansas City, MO.

URSULA TAYLOR, Strategic Health Law, Chapel Hill, NC, for amicus curiae Blue Cross Blue Shield Association in 2017-1994. Also represented by SANDRA J. DURKIN, Butler Rubin Saltarelli & Boyd LLP, Chicago, IL.

BENJAMIN N. GUTMAN, Oregon Department of Justice, Salem, OR, for amici curiae State of Oregon, State of Alaska, State of California, State of Connecticut, State of Delaware, State of Hawaii, State of Kentucky, State of Maryland, State of Massachusetts, State of Minnesota, State of New Mexico, State of North Carolina, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Washington, State of Wyoming, District of Columbia in 2017-1994. Also represented BY ELLEN F. ROSENBLUM. State of Oregon also represented by PEENESH SHAH.

LESLIE BERGER KIERNAN, Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, DC, for amicus curiae America's Health Insurance Plans in 2017-1994, 2017-1224. Also represented by ROBERT K. HUFFMAN, PRATIK A. SHAH; RUTHANNE MARY DEUTSCH, HYLAND HUNT, Deutsch Hunt PLLC, Washington, DC; RALPH C. NASH, George Washington University Law School, Washington, DC.

STEPHEN A. SWEDLOW, Quinn Emanuel Urquhart & Sullivan, LLP, Chicago, IL, for amici curiae Health Re-

public Insurance Company, Common Ground Healthcare Cooperative, Kate Bundorf, Scott Harrington, Mark Pauly, Michael Chernew, Thomas McGuire, Leemore Dafny, Kosali Simon in 2017-1224. Amicus curiae Health Republic Insurance Company also represented by J. D. HORTON, ADAM WOLFSON, Los Angeles, CA.

———————————

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, MOORE, REYNA, WALLACH, TARANTO, CHEN, HUGHES, and STOLL, *Circuit Judges.**

NEWMAN*, Circuit Judge*, with whom WALLACH*, Circuit Judge*, joins, dissents from the denial of the petitions for rehearing en banc.

WALLACH*, Circuit Judge*, with whom NEWMAN*, Circuit Judge*, joins, dissents from the denial of the petitions for rehearing en banc.

PER CURIAM.

## O R D E R

Appellee Moda Health Plan, Inc. and appellants Land of Lincoln Mutual Health Insurance Company and Maine Community Health Options each filed petitions for rehearing en banc. Appellant Blue Cross and Blue Shield of North Carolina filed a petition for panel rehearing and rehearing en banc. A response to the petitions was invited by the court and filed by the United States. Several motions for leave to file amici curiae briefs were filed and granted by the court. The petitions for rehearing, response, and amici curiae briefs were first referred to the panel that heard the appeals, and thereafter to the circuit judges who are in regular active service. A poll was requested, taken, and failed.

———————————

\*     Circuit Judge O'Malley did not participate.

Upon consideration thereof,

IT IS ORDERED THAT:

The petitions for panel rehearing are denied.

The petitions for rehearing en banc are denied.

The mandates of the court will issue on November 13, 2018.

FOR THE COURT

November 6, 2018                /s/ Peter R. Marksteiner
     Date                        Peter R. Marksteiner
                                 Clerk of Court

# United States Court of Appeals
# for the Federal Circuit

———————————

**MODA HEALTH PLAN, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

———————————

2017-1994

———————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00649-TCW, Judge Thomas C. Wheeler.

------------------------

**LAND OF LINCOLN MUTUAL HEALTH INSURANCE COMPANY, AN ILLINOIS NON-PROFIT MUTUAL INSURANCE CORPORATION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2017-1224

———————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00744-CFL, Judge Charles F. Lettow.

------------------------

**BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2017-2154

————————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00651-LKG, Judge Lydia Kay Griggsby.

------------------------

**MAINE COMMUNITY HEALTH OPTIONS,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2017-2395

————————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00967-EGB, Senior Judge Eric G. Bruggink.

---

NEWMAN*, Circuit Judge*, with whom WALLACH*, Circuit Judge*, joins, dissenting from denial of the petition for rehearing en banc.

The judiciary's role is to assure fidelity to law and to the Constitution. The Federal Circuit has a special responsibility as a national court, for no other circuit court is in our jurisdictional loop. Thus when questions of national impact reach us, it devolves upon us to bring the full potential of the court to bear.

The national impact of these health insurance cases, coupled with the role of "appropriations riders" as a legislative tool, led to a split panel decision; and the ensuing requests for reconsideration have been accompanied by amicus curiae briefs on behalf of the insurance industry, state governments, economists and other scholars, and the public, advising us on the law, the Constitution, the legislative process, and the national interest. From the court's denial of rehearing en banc, I respectfully dissent.

The facts are simple; the principle large. The critical question concerns the methods by which the government deals with non-governmental entities that carry out legislated programs. Here, in order to persuade the nation's health insurance industry to provide insurance to previously uninsured or uninsurable persons, and thus to take insurance risks of unknown dimension, the Affordable Care Act[1] provided that insurance losses over a designated percentage would be reimbursed, and comparable profits would be turned over to the government—the "risk corridors" program.

---

[1]   Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010).

With this statutory commitment that the government "shall pay," 42 U.S.C. § 18062(b), the nation's insurance industry provided the designated health insurance. However, when large losses were experienced by some carriers, the government refused to appropriate the funds to pay the statutory shortfall, and required that existing funds not be used for this purpose. Thus the insurers, who had performed their part of the bargain, were denied the promised compensation. My colleagues now ratify that denial.

This is a question of the integrity of government. "It is very well to say that those who deal with the Government should turn square corners. But there is no reason why the square corners should constitute a one-way street." *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 387–88 (1947) (Jackson, J., dissenting); *see also* 48 C.F.R. § 1.102(b)(3) ("The Federal Acquisition System will . . . [c]onduct business with integrity, fairness, and openness."). Our system of public-private partnership depends on trust in the government as a fair partner. And when conflicting interests arise, assurance of fair dealing is a judicial responsibility.

I have previously elaborated on the violations of law and legislative process that apparently are ratified by the panel majority, *see Moda Health Plan, Inc. v. United States,* 892 F.3d 1311, 1331–40 (Fed. Cir. 2018) (Newman, J., dissenting). On these petitions for rehearing en banc, many amici curiae have provided advice. For example, America's Health Insurance Plans, a national association of the insurance industry, states:

> The panel majority's opinion, however, now makes it a risky business to rely upon the government's assurances. That deals a crippling blow to health insurance providers' business relationships with the government, which depend upon the provid-

ers' ability to trust that the government will act as a fair partner.

Br. of America's Health Ins. Plans, Inc. as Amicus Curiae in Supp. of Reh'g En Banc at 3, Aug. 20, 2018, ECF No. 111.

The amici report that this government action has caused significant harm to insurers who participated in the Affordable Care Act program. The National Association of Insurance Commissioners informs the court that "only six of the 24 CO-OPs operating at peak participation were still in business," and that the government's refusal to make the promised payments "transformed the Exchanges from promising to punitive for the insurance industry." Br. of Amicus Curiae The Nat'l Ass'n of Ins. Comm'rs in Supp. of Pl.-Appellee at 12, 14, Aug. 28, 2017, ECF No. 51. The Court of Federal Claims put it plainly, that the government's position that it can renege on its legislated and contractual commitments "is hardly worthy of our great government." *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436, 466 (2017).

In the national interest, there is even more at stake than these promises to the health insurance industry. The government's access to private sector products and services is undermined if non-payment is readily achieved after performance by the private sector. The Court has stated that "[i]f the Government could be trusted to fulfill its promise to pay only when more pressing fiscal needs did not arise, would-be contractors would bargain warily—if at all—and only at a premium large enough to account for the risk of nonpayment." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191–92 (2012).

Our national strength is our government ruled by law. The implementation of that rule has been reinforced in history: "It is as much the duty of Government to render prompt justice against itself in favor of citizens as it is to administer the same between private individuals." Abra-

ham Lincoln, First Annual Message to Congress (Dec. 3, 1861), *reprinted in* James D. Richardson, A Compilation of the Messages and Papers of the Presidents 1789-1897, vol. VI 44, 51 (1897).

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). At a minimum, this court should review this matter en banc. From the denials of rehearing, I respectfully dissent.

# United States Court of Appeals
# for the Federal Circuit

———————————

**MODA HEALTH PLAN, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

———————————

2017-1994

———————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00649-TCW, Judge Thomas C. Wheeler.

------------------------

**LAND OF LINCOLN MUTUAL HEALTH INSURANCE COMPANY, AN ILLINOIS NON-PROFIT MUTUAL INSURANCE CORPORATION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2017-1224

———————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00744-CFL, Judge Charles F. Lettow.

------------------------

**BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2017-2154

————————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00651-LKG, Judge Lydia Kay Griggsby.

------------------------

**MAINE COMMUNITY HEALTH OPTIONS,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2017-2395

————————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00967-EGB, Senior Judge Eric G. Bruggink.

WALLACH, *Circuit Judge*, with whom NEWMAN, *Circuit Judge*, joins, dissenting from the denial of the petition for rehearing en banc.

This case involves the obligation of Appellant United States ("the Government") to make so-called "risk corridors payments" to providers of certain health insurance plans, with the payments designed to help insurers mitigate risk when joining the new healthcare exchanges created by the Patient Protection and Affordable Care Act ("ACA"). *See* Pub. L. No. 111-148, 124 Stat. 119 (2010). The panel majority holds that, although it agrees with Appellee Moda Health Plan, Inc. ("Moda") that "the plain language of section 1342 [of the ACA, i.e., 42 U.S.C. § 18062 (2012)] created an obligation of the [G]overnment to pay participants in the health benefit exchanges the full amount indicated by the statutory formula for payments out under the risk corridors program," *Moda Health Plan, Inc. v. United States*, 892 F.3d 1311, 1322 (Fed. Cir. 2018), Congress repealed or suspended the Government's obligation to make the risk corridors payments by subsequently enacting *riders to appropriations bills*, *see id.* at 1322, 1331. However, the majority's holding regarding an implied repeal of the Government's obligation cannot be squared with Supreme Court precedent, which states that "[t]he doctrine disfavoring repeals by implication applies with full vigor when the subsequent legislation is an *appropriations* measure." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) (internal quotation marks, ellipsis, and citations omitted). Because I believe the appropriations riders did not impliedly repeal the Government's obligations to make risk corridors payments, I respectfully dissent from the denial of the petition for rehearing en banc.

DISCUSSION

## I. The Government Is Legally Obligated to Make Risk Corridors Payments

Section 1342(a) of the ACA provides that the Secretary of the U.S. Department of Health and Human Services ("HHS")

> shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan [("QHP")] offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums.

42 U.S.C. § 18062(a). The ACA provides a statutory formula whereby HHS receives "[p]ayments in" from QHP issuers that have excess profits and makes certain "[p]ayments out" to QHP issuers with excess losses. *Id.* § 18062(b)(1), (2). "Because insurers lacked reliable data to estimate the cost of providing care for the expanded pool of individuals seeking coverage via the new [ACA] exchanges, insurers faced significant risk if they elected to offer plans in these exchanges," and the risk corridors program was "designed to mitigate that risk and discourage insurers from setting higher premiums to offset that risk." *Moda*, 892 F.3d at 1314; *see id.* at 1315 ("The risk corridors program permitted issuers to lower premiums by not adding a risk premium to account for perceived uncertainties in the 2014 through 2016 markets." (internal quotation marks, brackets, and citation omitted)). HHS explained "[t]he risk corridors program is not statutorily required to be budget neutral . . . . HHS will remit payments as required under [§] 1342." *Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014*, 78 Fed. Reg. 15,410, 15,473 (Mar. 11, 2013).

Moda, for example, began participating in the health care exchanges as an issuer of QHPs in 2014. J.A. 61–62. As of March 2017, Moda was owed the following payments out under the risk corridors program: "$75,879,282.72 for benefit year 2014 and $133,951,163.07 for benefit year 2015, for a total of $209,830,445.79." J.A. 41 (Joint Status Report); *see* J.A. 44 (entering judgment, by Court of Federal Claims, for the total amount).

I agree with the majority that § 1342 obligates the Government to make risk corridors payments. I begin with the plain language of § 1342. *See BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (providing that statutory interpretation "begins with the statutory text"); *see also Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) ("It is a fundamental cannon of statutory construction that . . . words will be interpreted as taking their ordinary, contemporary, common meaning." (internal quotation marks and citation omitted)). Section 1342 uses the word shall to define HHS's risk corridors obligations. *See* 42 U.S.C. § 18062(a) (reciting that HHS "*shall* establish and administer a program of risk corridors" (emphasis added)), (b)(1) (dictating that HHS "*shall* provide under the program" certain payments out (emphasis added)), (b)(1)(A) (stating that when "a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, [HHS] *shall pay* to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount" (emphasis added)), (b)(1)(B) (stating that when "a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, [HHS] *shall pay* to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount" (emphasis added)).

The word shall typically sets forth a command. *See* 1A N. Singer & J. Singer, Sutherland on Statutes and

Statutory Construction § 32A:11 (7th ed. 2009) ("The use of the word [shall] as a command is now firmly fixed, both in common speech, in the second and third persons, and in legal phraseology."). "Dictionaries from the era of . . . enactment," *Sandifer*, 571 U.S. at 228, establish that shall generally imposes a mandatory duty, *see Shall, Black's Law Dictionary* (9th ed. 2009) (defining shall as "[h]as a duty to; more broadly, is required to" and explaining "[t]his is the mandatory sense that drafters typically intend and that courts typically uphold"); *Shall, Webster's New World College Dictionary* (4th ed. 2009) (explaining that shall is often "used . . . to express determination, compulsion, obligation, or necessity"). Although the "circumstances, or the context of an act" may indicate that the word shall is to be interpreted as "merely permissive, rather than imperative," Sutherland § 32A:11, nothing in § 1342 or the ACA indicates that the use of the word shall in relation to the Government's obligation to make risk corridors payments was intended to be interpreted in the permissive sense, rather than the imperative, *see* 42 U.S.C. § 18062. *See generally* Pub. L. No. 111-148, 124 Stat. 119. Indeed, the Supreme Court has routinely treated the word shall as an imperative. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1352 (2018) ("The word 'shall' generally imposes a nondiscretionary duty . . . ."); *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall[]' . . . normally creates an obligation impervious to judicial discretion." (citation omitted)). Therefore, the plain language of § 1342 requires HHS to make certain payments out in accordance with the statutory formula provided therein. *See* 42 U.S.C. § 18062(b)(1).

Section 1342 establishes this duty without respect to budgetary considerations, such as achieving budget

neutrality or availability of appropriations. *See id.* § 18062; *see also Greenlee Cty. v. United States*, 487 F.3d 871, 878 (Fed. Cir. 2007) (providing a situation where a statute subjected Government liability for payments to the county to amounts appropriated by Congress). Therefore, as the panel majority found, the statutory text unambiguously obligates the Government to make the full risk corridors payments. *See Moda*, 892 F.3d at 1322 ("We conclude that the plain language of [§] 1342 *created an obligation* of the [G]overnment to pay participants in the health benefit exchanges *the full amount* indicated by the statutory formula for payments out under the risk corridors program." (emphases added)).

## II. The Appropriations Riders Did Not Impliedly Repeal the Government's Obligation

"As a general rule, repeals by implication are not favored. This rule applies with *especial force* when the provision advanced as the repealing measure was enacted *in an appropriations bill*." *United States v. Will*, 449 U.S. 200, 221–22 (1980) (emphases added) (internal quotation marks and citations omitted). "The whole question depends on the intention of Congress as expressed in the statutes." *United States v. Mitchell*, 109 U.S. 146, 150 (1883). The Supreme Court looks for "words that expressly, or by clear implication, modified or repealed the previous law." *United States v. Langston*, 118 U.S. 389, 394 (1886).

When Congress passed an appropriations bill to HHS in December 2014 for fiscal year 2015, it included an appropriations rider stating:

> *None of the funds* made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the 'Centers for Medicare and Medicaid Services—Program Management' account,

> *may be used for payments* under
> [§] 1342(b)(1) . . . (relating to risk corridors).

Consolidated and Further Continuing Appropriations Act, 2015 ("FY 2015 Appropriations"), Pub. L. No. 113-235, div. G, § 227, 128 Stat. 2130, 2491 (emphases added). Appropriations riders for fiscal years 2016 and 2017 included identical language. Consolidated Appropriations Act, 2017 ("FY 2017 Appropriations"), Pub. L. No. 115-31, div. H, title II, § 223, 131 Stat. 135, 543; Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, § 225, 129 Stat. 2242, 2624.[1]

These appropriations riders do not clearly establish that Congress intended to repeal the Government's obligation to make risk corridors payments. The riders do not address *whether the obligation remains payable* and, at most, only address *from whence the funds to pay the obligation may come. See, e.g.*, FY 2015 Appropriations § 227. The present case is similar to *Langston*, in which the Supreme Court held that "a statute fixing the annual salary of a public officer at a named sum, without limitation as to time," was not "deemed abrogated or suspended by subsequent enactments which merely appropriated a less amount . . . and which contained no words that

---

[1] The majority's holding was limited to the appropriations riders for fiscal years 2015 and 2016 because the appropriations rider for fiscal year 2017 "had not yet been enacted before this case completed briefing." *Moda*, 892 F.3d at 1322 n.4. The majority explained that "[t]he [G]overnment's argument [for an implied repeal] applies equally" to the 2017 appropriations rider. *Id.* That appropriations rider became law in May 2017. *See generally* FY 2017 Appropriations. The majority's opinion, therefore, has the effect of repealing risk corridor payments for each of the years obligated by § 1342, i.e., 2014–2016. *See* 42 U.S.C. § 18062(a).

expressly, or by clear implication, modified or repealed the previous law." 118 U.S. at 394. There, the claimant held a position, for which a statute indicated a person serving in that position "shall be entitled to a salary of $7,500 a year." *Id.* at 390 (internal quotation marks and citation omitted). While in some subsequent appropriations acts Congress appropriated the full $7,500, Congress appropriated only $5,000 for that particular position in appropriations acts for fiscal years 1883 and 1884. *See id.* at 391. The Supreme Court held the claimant was still due $7,500 for 1883 and 1884 because the salary "was originally fixed at the sum of $7,500," and "[n]either of the acts appropriating $5,000 . . . contains any language to the effect that such sum shall be 'in full compensation' for those years" nor did either contain "an appropriation of money 'for additional pay,' from which it might be inferred that [C]ongress intended to repeal the act fixing his annual salary at $7,500." *Id.* at 393. The Supreme Court found it "not probable that [C]ongress" would "make a permanent reduction of [claimant's] salary, without indicating its purpose to do so, either by express words of repeal, or by such provisions as would compel the courts to say that harmony between the old and the new statute was impossible." *Id.* at 394.

Similarly, the appropriations riders at issue, enacted after Congress imposed the risk corridors payment obligation in the ACA, appropriated a lower amount. The riders *do not state* that this lower amount serves as full satisfaction of the Government's obligation under § 1342. *See, e.g.*, FY 2015 Appropriations § 227. Nor do the appropriations riders cut off *all* sources of funding for the risk corridors program. *See, e.g.*, *id.* (specifying particular funds from which risk corridors payments may not be made). In *Gibney v. United States*, our predecessor court held that appropriations language similar to the riders here was "a mere limitation on the expenditure of a particular fund," and "d[id] not have the effect of either

repealing or even suspending an existing statutory obligation any more than the failure to pay a note in the year in which it was due would cancel the obligation stipulated in the note." 114 Ct. Cl. 38, 50–51 (1949); *see N.Y. Airways, Inc. v. United States*, 369 F.2d 743, 752 (Ct. Cl. 1966) (explaining "the failure of Congress . . . to appropriate or make available sufficient funds does not repudiate the obligation").

Akin to the situation here, the appropriations bill in *Gibney* stated "*none of the funds* appropriated for the Immigration and Naturalization Service *shall be used to pay* compensation for overtime services." 114 Ct. Cl. at 48 (emphases added); *see* FY 2015 Appropriations § 227 ("*None of the funds* made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the 'Centers for Medicare and Medicaid Services—Program Management' account, *may be used for payments* under [§] 1342(b)(1) . . . ." (emphases added)); *see also Beer v. United States*, 696 F.3d 1174, 1185 (Fed. Cir. 2012) (en banc) (holding that a 2001 amendment to an appropriations bill did not impliedly repeal a 1989 law that guaranteed judicial cost of living adjustments). Because I believe § 1342 is "reasonabl[y] constru[ed]" as setting forth the Government's obligation to make risk corridors payments out and the appropriations riders as simply designating from which funds the payments out may not be made, I believe we must "give effect to the provisions of each," rather than finding the statutory obligation impliedly repealed. *Langston*, 118 U.S. at 393.

Although the majority points to a single statement made during legislative debates for the 2015 appropriations rider to support its position that each appropriations rider intended to make the risk corridors program budget neutral, *see Moda*, 892 F.3d at 1325, this statement hardly provides the requisite clear legislative intent for

an implied repeal.  Then-Chairman of the House Committee on Appropriations Harold Rogers stated:

> In 2014, HHS issued a regulation stating that the risk corridor program will be budget neutral, meaning that the federal government will never pay out more than it collects from issuers over the three year period risk corridors are in effect.  The agreement includes new bill language to prevent the [Centers for Medicare and Medicaid Services] Program Management appropriation account from being used to support risk corridors payments.

160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014).  However, the Supreme Court has indicated "[t]he whole question depends on the intention of [C]ongress *as expressed in the statutes*." *Mitchell*, 109 U.S. at 150.  It is not appropriate to rely on Chairman Rogers's statement to inject ambiguity into the appropriations riders' plain meaning.  *See Gibney*, 114 Ct. Cl. at 53 ("We must take what the [appropriations bill] says and not what one member of [Congress] might have been under the impression it contained.").  Even if it is appropriate to look beyond the text of the statutes, the above statement does not support the majority's position.  Chairman Rogers did not say that the 2015 *appropriations rider* sought to make the risk corridors program budget neutral; instead, he said that such was the goal of *an HHS regulation* and that the 2015 appropriations rider sought to designate from which funds the payments out may not be made.  *See* 160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014).  Chairman Rogers said nothing about the 2015 appropriations rider's effect on the Government's *obligation* to make payments out.  *See id.*

If anything, I believe it is more probative of legislative intent that Congress, eight months before it passed the first appropriations rider, introduced legislation to repeal the Government's obligation to make full risk corridors

payments by requiring budget neutrality, but failed to pass that legislation. *See* Obamacare Taxpayer Bailout Protection Act, S. 2214, § 2, 113th Cong. (2014) (proposing to add to § 1342 a subsection that states that HHS "shall ensure that payments out and payments in . . . are provided for in amounts that [HHS] determines are necessary to reduce to zero the cost"); *see also Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 210 (1962) ("When the repeal of a highly significant law is urged upon [Congress] and that repeal is rejected after careful consideration and discussion, the normal expectation is that courts will be faithful to their trust and abide by that decision."), *overruled on other grounds by Boys Mkts., Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970). Less than two months after enacting the first of the appropriations riders, Congress considered but did not pass legislation solely meant to make the risk corridors program budget neutral. *See* Taxpayer Bailout Protection Act, H.R. 724, § 2, 114th Cong. (2015) (providing that payments out should not exceed payments in); Taxpayer Bailout Protection Act, S. 359, § 2, 114th Cong. (2015) (same). While we are generally "reluctant to draw inferences from the failure of Congress to act," *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 220 (1983), I understand these facts to support a finding that Congress did not intend the appropriations riders either to repeal the Government's obligation to make risk corridors payments or to decrease the Government's exposure to liability by temporarily capping the amount of payments by making the program budget neutral, *see id.* (stating "it would . . . appear improper for us to give a reading to [an a]ct that Congress considered and rejected").

While the majority attempts to cast its opinion as holding "that Congress enacted *temporary* measures capping risk corridor payments out at the amount of payments in," *Moda*, 892 F.3d at 1327 (emphasis added),

this characterization does not withstand scrutiny. Under the majority's holding, the appropriations riders have substantively altered the Government's § 1342 obligations for *every year* of the risk corridors program by no longer requiring the Government to make payments out subject to the statutory formula. *See id.* at 1322; *see also* 42 U.S.C. § 18062(b)(1) (providing the statutory formula for payments out). For instance, in the case of Moda, the Government has not made the full payments out in 2014, as calculated by the formula, and has not made *a single* payment out in 2015. *See Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436, 448 (2017). Accordingly, I believe the majority erred in its consideration of the appropriations riders.

### III. This Case Raises an Exceptionally Important Issue Regarding the Government's Reliability as an Honest Broker

The majority's holding casts doubt on the Government's continued reliability as a business partner in all sectors. The Government induced health insurance providers to enter the risky health exchanges through, inter alia, the risk corridors program. *See* Bundorf et al. Amicus Br. ("Economists & Professors Amicus Br.")[2] 3–7, *Land of Lincoln Health Ins. Co. v. United States*, No. 2017-1224, ECF No. 188. As the majority acknowledges, "[b]ecause insurers lacked reliable data to estimate the cost of providing care for the expanded pool of individuals seeking coverage via the new [ACA] exchanges, insurers faced significant risk if they elected to offer plans in these exchanges." *Moda*, 892 F.3d at 1314. The risk corridors program was "designed to mitigate that risk and discourage insurers from setting higher premiums to offset that

---

[2]     This amicus brief was submitted by "distinguished economists and professors of health policy, economics, and management." Economists & Professors Amicus Br. 1.

risk" by "permit[ting] issuers to lower premiums by not adding a risk premium to account for perceived uncertainties in the 2014 through 2016 markets." *Id.* at 1314, 1315 (internal quotation marks, brackets, and citation omitted). Therefore, "[b]y reducing the risk of participating in a newly created market, the Government encouraged firms to enter a new market[, i.e., the health care exchanges,] characterized by considerable uncertainty in the risk profile of potential enrollees (and, thus, profitability)." Economists & Professors Amicus Br. 6.

QHP issuers, like Moda, entered the health care exchanges and set premiums with the belief that they would receive risk corridors payments, *see* J.A. 61–62, and Congress, subsequently, passed the relevant appropriations riders, *see, e.g.*, FY 2015 Appropriations § 227. To hold that the Government can abrogate its obligation to pay through appropriations riders, after it has induced reliance on its promise to pay, severely undermines the Government's credibility as a reliable business partner. For example, the ACA also "clearly and unambiguously imposes an obligation on . . . HHS to make payments to health insurers that have implemented cost-sharing reductions on their covered plans," *Montana Health Co-Op v. United States*, No. 18-143C, 2018 WL 4203938, at \*5 (Fed. Cl. Sept. 4, 2018), but the Government refused to make those payments for reasons similar to those here, *see id.* at \*1.

The Government's refusal to honor its obligation has important consequences. "Based on the Government's own official calculations, QHP [i]ssuers are owed about $12.3 billion dollars for the 2014–2016 plan years." Health Republic Ins. Co. & Common Ground Healthcare Cooperative's Amicus Br. ("Health Republic Amicus Br.") 9, *Land of Lincoln Health Ins. Co. v. United States*, No. 2017-1224, ECF No. 189; *see Moda*, 892 F.3d at 1319 (acknowledging that the Government's shortfall of payments out equaled "more than $12 billion"). These short-

falls have negatively affected not only health insurance providers but also health insurance recipients. For instance, by the end of 2016, eighteen of twenty-four health cooperatives that were participating in the exchanges were no longer in business because a lack of capital, in part, due to the lack of risk corridors payments. Nat'l Ass'n of Ins. Comm'rs Amicus Br. 12–13, *Moda Health Plan, Inc. v. United States*, No. 2017-1994, ECF No. 51. Several health insurance companies "withdrew from the ACA exchanges entirely," and others still offering plans "had to compensate for this uncertainty in payment by offering health plans at *higher prices* than before." Health Republic Amicus Br. 11 (emphasis added). These consequences, which impact the cost of health care insurance for virtually all Americans, make this case fit for en banc consideration.

CONCLUSION

Rather than faithfully applying Supreme Court and our precedent disfavoring repeals by implication, *see, e.g.*, *Tenn. Valley Auth.*, 437 U.S. at 190, the majority holds that Congress *clearly* manifested its intent to repeal the Government's statutory obligation to make risk corridors payments pursuant to the ACA's formula, *see* 42 U.S.C. § 18062, through appropriations riders. I believe this conclusion is unsound. Thus, I respectfully dissent from the court's denial of the petition for rehearing en banc as to all of the above-captioned cases.